**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-cv-01773-CMA

MICHAEL P. ATKINSON,

      Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

      Defendant.

---

**ORDER AFFIRMING ADMINISTRATIVE LAW JUDGE'S DECISION**

---

**I.  OVERVIEW**

This is a social security benefits appeal brought under 42 U.S.C. § 405(g).

Plaintiff Michael P. Atkinson challenges the final decision of Defendant, the

Commissioner of Social Security ("Commissioner"), denying his application for social

security disability and supplemental security income benefits.  The denial was affirmed

by an administrative law judge ("ALJ"), who ruled Plaintiff was not disabled within the

meaning of the Social Security Act ("Act").  Plaintiff argues the ALJ committed three

errors:

    (1)     The ALJ failed to properly evaluate the examining and consulting

               physicians' opinions in determining Mr. Atkinson's Residual Functional

               Capacity ("RFC").

    (2)     The ALJ failed to properly consider Mr. Atkinson's subjective complaints.

(3)     The ALJ's conclusion that Mr. Atkinson could perform other work is not

supported by substantial evidence.

(Doc. # 16.)

Plaintiff requests an order reversing and remanding the ALJ's decision.  (*Id.* at

20.)  After considering both sides' arguments, the ALJ's opinion is AFFIRMED.

## II.  FACTS

### A.     MEDICAL EVIDENCE

Plaintiff was born on June 17, 1976, and was 28 years old at the onset of his

alleged disability.  (Doc. # 11 at 18, 70.)  He completed the tenth grade and some

special education courses and has worked in the vocationally relevant past as a fast

food clerk.  *(Id.* at 39, 124.)  He alleges that he became disabled on April 30, 2005, and

stopped working, due to bipolar disorder, post-traumatic stress disorder, seizure

disorder, and anger problems.  (*Id.* at 70, 103, 107.)

In June 2005, Plaintiff visited Peak Vista Community Health Center a couple

times complaining of seizures.  He was prescribed Dilantin.  He also received a CT scan

of his head on June 7, 2005, which revealed no abnormalities.  (*Id.* at 139-147.)

On September 30, 2006, Greg Finnoff, D.O., examined Plaintiff in connection

with his claim for benefits.  Plaintiff complained of grand mal seizure disorder, bipolar

disorder, and major depression.  Plaintiff reported that he began having seizures at age

15 and that he suffered three to four seizures per month, including one two weeks

earlier.  He noted that his seizures had been controlled by Dilantin, but that he had been

off the medication for two months.  He also reported that he also suffered from bipolar disorder and depression, which began in 1992.  Although homeless, Plaintiff told Dr. Finnoff he was able to take care of activities of daily living without difficulty.  There were no medical records for Dr. Finnoff to review.  (*Id.* at 148-152.)

Dr. Finnoff noted that Plaintiff had an old right knee injury with an ACL separation.  Despite the knee injury, Dr. Finnoff reported an "essentially normal physical examination," anticipating that Plaintiff could stand, walk, sit, and lift and carry without restriction.  Dr. Finnoff diagnosed a seizure disorder, bipolar disorder, and major depression, and noted that Plaintiff had been on Zoloft but was currently unmedicated.  He assessed that Plaintiff "would have environmental restrictions secondary to his seizure disorder.  He would not be able to drive or be in any environment with extremes of temperature, around any heavy machinery, or be in any dangerous work environment."  (*Id.*)

On October 5, 2006, Shirley Robbins, Psy.D., performed a psychological consultive examination on Plaintiff in connection with his application for benefits.  Plaintiff told Dr. Robbins that he was applying for disability because he had difficulty working around people.  He said he used to able to be with people all day, but now feels like he can be around others only two to three hours per day, and then he has to leave because of his anxiety.  He walked to the appointment because he was too nervous to ride a crowded bus.  Additionally, Plaintiff claimed he had trouble controlling his temper since age 15, that he had a bout of depression when his stepfather died in 1991, and

that he had been depressed since separating from his wife in June 2006.  Plaintiff also

reported that he had three to four grand mal seizures per month.  Regarding his knee

problems, he told Dr. Robbins that he tore ligaments in his right knee after stepping off a

curb incorrectly in 2002; this resulted in chronic and severe pain (typically a nine on a

ten-point scale).  (*Id.* at 153-160.)

Dr. Robbins found that Plaintiff's concentration was fair, as was his judgment and

reasoning, his abstract thinking, and his knowledge of general information.  (*Id.* at 158.)

Dr. Robbins assessed social anxiety disorder, intermittent explosive disorder, panic

disorder, R/O bipolar disorder, major depression, post traumatic stress disorder,

cannabis abuse, alcohol and methamphetamine abuse in remission, narcissistic traits,

and seizure disorder.  (*Id.*)  She noted that Plaintiff demonstrated a "poor me" attitude,

projecting blame for his troubles onto other people or situations.  (*Id.* at 156.)

Dr. Robbins assessed Plaintiff a Global Assessment of Functioning (GAF) Score of 44,

although she did not explain how she reached that score or its implications for Plaintiff's

ability to work.  (*Id.* at 158.)  Indeed, she offered no opinion regarding Plaintiff's ability

to work but concluded that he appeared competent to handle his own finances.  (*Id.*)

In October 2006, John Valvano, a medical consultant, reviewed Plaintiff's record

and completed a physical residual functional capacity assessment of Plaintiff.  By

checking the appropriate boxes, Mr. Valvano offered the following opinions regarding

Plaintiff: that he could perform work at any exertional level, but should never climb

ladders, ropes, and scaffolds; could occasionally balance; and should avoid even

4

moderate exposure to hazards such as machinery and heights.  Mr. Valvano also remarked that Plaintiff's statements regarding his symptoms were not credible because Plaintiff was not compliant with prescribed treatment for his seizure disorder.  Moreover, Mr. Valvano gave full weight to the opinion of Dr. Finnoff.  (*Id.* at 161-168.)

Also in October 2006, Donald G. Glasco, M.D., a psychiatrist, completed a mental residual functional capacity assessment and psychiatric review technique form. In the psychiatric review technique form, Dr. Glasco indicated that Plaintiff suffered from depression, anxiety, a personality disorder, and problems with substance abuse.  (*Id.* at 177-82.)  He also acknowledged that Plaintiff had mild restrictions in activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, or pace.  (*Id.* at 184.)  Similar to Dr. Robbins' comment, Dr. Glasco indicated that Plaintiff demonstrated a "poor me" attitude, pursuant to which he projected blame onto others.  (*Id.* at 186.)

In the mental residual functional capacity assessment, Dr. Glasco identified moderate limitations in Plaintiff's ability to handle instructions, concentrate, interact with the public, get along with co-workers, and respond to criticism and change in the work environment.  Despite these limitations, Dr. Glasco concluded that Plaintiff was capable of work of limited complexity.  Although Plaintiff could not work closely with supervisors, co-workers, or the general public, Dr. Glasco thought Plaintiff could accept supervision and related to coworkers if contact was not frequent or prolonged.  (*Id.* at 170-72.)

On May 11, 2007, one week after his knee buckled while chasing a dog, Plaintiff, complaining of knee pain, was evaluated by David M. Bierbrauer, M.D.  Dr. Bierbrauer noted that Plaintiff could not stand and bear weight without a knee immobilizer and he was tender in his right knee.  He also noted there was minimal swelling of the knees and that Plaintiff could demonstrate full extension and flexion.  Dr. Bierbrauer diagnosed bilateral chronic ACL deficiencies and noted a possible meniscal tear.  (*Id.* at 188-89.) He explained to Plaintiff that these were elective problems.  Plaintiff underwent an MRI on his left knee on June 4, 2007.  (*Id.* at 190.)  The MRI revealed undersurface tearing of the posterior horn and body of the medial meniscus, a 2 cm cyst, small joint effusion, and patellofemoral grade III chonodromalacia.  (*Id.*)

On November 2, 2007, Andrea Cox completed a Med-9 form for the Colorado Department of Human Services.  Ms. Cox indicated that Plaintiff was disabled for twelve months or longer due to anxiety, attention deficit disorder ("ADD"), and attention deficit hyperactivity disorder ("ADHD").  (*Id.* at 192-95.)  Plaintiff reported to Ms. Cox that he was diagnosed with ADD and ADHD at age eight.  Ms. Cox also noted that Plaintiff had difficulty with social interactions. (*Id.* at 194.)

## B.    PROCEDURAL HISTORY

On August 11, 2006, Plaintiff filed an application for Disability Insurance Benefits. He filed a separate application for Supplemental Security Income on August 17, 2006. (Doc. # 11 at 61, 70-80.)  The Social Security Administration denied Plaintiff's

applications, and Plaintiff filed a timely request for a hearing before an ALJ.  (Doc. # 11 at 53-54.)

      1.   Administrative Hearing

 On February 6, 2008, the ALJ held a hearing, at which Plaintiff testified.  (*Id.* at 28.)  Plaintiff testified that he was currently working at Sonic Drive-In as a cook, for three to four hours on a daily basis, with breaks of five to ten minutes every couple hours to rest his knees.  (*Id.* at 28, 37.)

Though both knees cause him pain, he testified his left knee was worse.  He reported "serious pains" in the side of his left knee.  Plaintiff was not taking any pain medication, nor was he taking Dilantin, a medication he had been prescribed for his seizures, because he could not afford it.   (*Id.* at 28-29.)

Plaintiff testified that he has seizures two to three times a month, each lasting for a couple minutes.  He suspected that most of his seizures occur while sleeping, due to the way he feels in the morning: tired, shaky, and with disorganized thoughts.  After having a seizure, Plaintiff said he oftentimes has to rest afterward; in the case of a "really bad one" he may require three to four hours of sleep.  Even a moderate seizure requires an hour to three hours of recovery time.  He will not drive because of his seizures.  (*Id.* at 30-32.)

Aside from seizures, Plaintiff testified that he suffered from attention deficit disorder, hyperactivity, and social anxiety.  He explained how he cannot board buses or be in a crowded room for long without "getting real tight all over."  This causes him to

have to leave the situation.  Other situations that cause him similar anxiety include the soup kitchen, airports, or any other place with a large a crowd.  (*Id.* at 31-32.)

Plaintiff explained that he had other problems interacting with people apart from crowds.  He has problems accepting instructions from others and has argued in the past with both supervisors and co-workers.  Aside from arguing, he testified that he simply has difficulty recalling instructions, unless they are either written down or repeated to him several times.  (*Id.* at 32.)

Finally, Plaintiff testified that he has taken medication for depression in the past and that suffers from Posttraumatic Stress Disorder ("PTSD"), the cause of which was child abuse.  The PTSD comes about as "flashbacks."  (*Id.* at 34-35.)

A vocational expert (VE), Mr. Douglas Prutting, also testified.  He opined on a series of hypothetical questions posed by the ALJ.  (*Id.* at 40-41.)  The ALJ first asked the VE whether an individual with the following characteristics could perform any of Plaintiff's past relevant work:

> a person of Plaintiff's age, education, limited to an exertional level of full range of light with non-exertional limitations of no unprotected heights, no moving machinery, no hazardous work areas, no dealing with the general public, occasional dealing with co-workers, no complex tasks defined as an SVP of three or less, GEDs of one through three.

The VE answered "No."  The ALJ then asked whether there were other jobs compatible with those limitations, to which the VE provided as examples: assembler of small products, collator operator, and developer of automatic film.  *(Id.* at 40.)

The ALJ then added more conditions, asking how the following would impact competitive work:

> an individual with an exertional level of full range of light, no unprotected heights, no moving machinery, no hazardous work areas, no dealing with the general public, no dealing with co-workers or supervisors, no complex tasks, SVP three or less, GEDs one through three.

The VE replied that he knew of no job without employee or supervisor contact.  (*Id.*)

Finally, Plaintiff's counsel posed a hypothetical to the VE.  He asked the VE to consider a person of Plaintiff's age, education, and work experience but moderately limited in the following capacities:

> The ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with co-workers or peers without distracting them or exhibiting extreme behaviors, the ability to respond appropriately to changes in the work setting.

Would an individual limited in those areas be eliminated from performing Plaintiff's past relevant work?  The VE answered, "Yes."  (*Id.* at 42.)

2.     Administrative Decision

On April 5, 2008, the ALJ issued his opinion, ruling that Plaintiff was not disabled within the meaning of the Social Security Act.  Specifically, the ALJ found that:

1.     The claimant meets the insured status requirements of the Social Security Act through September 30, 2009.

9

2.    The claimant has not engaged in substantial gainful activity since April 30, 2005, the alleged onset date.

3.    The claimant has the following severe impairments: degenerative changes of the knees, a seizure disorder, an affective disorder, and an anxiety related disorder.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    The claimant has the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is precluded from working near unprotected heights, moving machinery, or hazardous work areas due to his history of seizure disorder.  In deference to his mental impairments he is precluded from interacting with the general public and limited to occasional interaction with co-workers.  He is also restricted from performing complex tasks and limited to work with an SVP of 3 or less and with GED levels of 1-3.

6.    The claimant is unable to perform any past relevant work.

7.    The claimant was born on June 17, 1976 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.    The claimant has a limited education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.   Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.   The claimant has not been under a disability, as defined in the Social Security Act, from April 30, 2005 through April 5, 2008.

(Doc. # 11 at 10-19.)  The ALJ also found Plaintiff lacked credibility.   He noted,

generally, that "the claimant has described a degree of physical and mental limitation

arising from his impairments which is not supported by the objective evidence of record,

10

the nature and frequency of his medical treatment, or his own activities of daily living."
(*Id.* at 14-15.)  With respect to Plaintiff's alleged seizure disorder, the ALJ expressed his
doubts by noting that, "[d]espite his claims of seizures occurring 2-3 times per month,
there is absolutely no medical evidence of record indicating [Plaintiff] has sought
treatment for a seizure since June 2005.  In his June 18, 2005 progress note it was
indicated that [Plaintiff's] seizures were well controlled by Dilantin."  (*Id.* at 17.)  The ALJ
further noted that the fact that Plaintiff was not currently taking Dilantin suggested the
seizures were not as bad as Plaintiff claimed.  (*Id.* at 15-16.)  Nonetheless, the ALJ
decided to account for Plaintiff's alleged seizures in the RFC.  (*Id.* at 16.)

With respect to Plaintiff's alleged mental disorders, the ALJ noted that "there
are no records in file of [Plaintiff] seeking or receiving treatment from any mental
health professional with the exception of the October 2006 psychological consultive
examination performed in conjunction with his disability application."  (*Id.* at 16.)

3.   Plaintiff's Appeal

In July 2008, the Appeals Council denied Plaintiff's request for review, thereby
rendering the ALJ's decision the final administrative decision for purposes of judicial
review.  (Doc. # 11 at 1.)  On August 19, 2008, Plaintiff filed a complaint challenging the
Commissioner's denial of disability benefits.  (Doc. # 3.)  Plaintiff filed his Opening Brief
on January 15, 2009.  (Doc. # 16.)  Defendant filed his Response Brief on February 2,
2009.  (Doc. # 18.)

### III.  ANALYSIS

#### A.      STANDARD OF REVIEW

The Court reviews the Commissioner's decision to determine whether substantial evidence in the record as a whole supports the factual findings and whether the correct legal standards were applied.  *See Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  Additionally, the Court may neither reweigh the evidence nor substitute its judgment for that of the agency.  *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006).

#### B.      EVALUATION OF DISABILITY

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than sixty-five years of age, and is under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A) (2006).

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits.  *See* 20 C.F.R. § 404.1520 (2008); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988).  That process requires the

adjudicator to consider whether a disability claimant: (1) engaged in substantial gainful

activity during the alleged period of disability; (2) had a severe impairment; (3) had a

condition which met or equaled the severity of a listed impairment; (4) could return

to her past relevant work; and, if not, (5) could perform other work in the national

economy.  *See id.*; *See* 20 C.F.R. § 404.1520(a)(4), 416.920(a)(4).  The claimant has

the burden of proof through steps one to four; the Social Security Administration has the

burden of proof at step five.  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  If a

decision regarding the claimant's disability can be reached at any step in the process,

further evaluation is unnecessary.  *Williams*, 844 F.2d at 750.

## C.   DISABILITY DETERMINATION

Plaintiff argues that the ALJ's determination of non-disability was erroneous

because of errors made at steps four and five of the sequential process.  In particular,

Plaintiff argues the ALJ failed to properly evaluate the examining and consulting

physicians' opinions in determining Plaintiff's RFC, failed to properly consider Plaintiff's

subjective complaints, i.e., his credibility, and because the ALJ's conclusion that Plaintiff

could perform other work is not supported by substantial evidence.

### 1.   The ALJ's Evaluation of the Examining and Consulting Physicians' Opinions in Determining Plaintiff's RFC

Plaintiff argues the ALJ failed to properly consider the opinions of Dr. Robbins

and Dr. Glasco in determining Plaintiff's RFC.  With respect to Dr. Robbins, Plaintiff

argues the ALJ ignored the GAF score Dr. Robbins gave Plaintiff and mischaracterized

Dr. Robbins' findings.  With respect to Dr. Glasco, Plaintiff argues that the ALJ ignored a

13

significant portion of Dr. Glasco's assessment and twice failed to account for

Dr. Glasco's opinion: first, in posing a question to the Vocational Expert and, second,

in his RFC assessment.

        a.     *Dr. Robbins*

        *(i) Global Assessment of Function ("GAF") Score*

        Plaintiff's argues that the ALJ erred by failing to discuss the GAF score assigned

to Plaintiff by Dr. Robbins.  It is true the ALJ did not discuss Plaintiff's GAF score;

however, he was not required to.

        It is correct, as Plaintiff points outs, that the ALJ must *consider* all relevant

medical evidence in reaching a conclusion as to a disability.  *Baker v. Bowen*, 886 F.2d

289, 291 (10th Cir. 1989).  However, the ALJ is not required to *discuss* every piece of

evidence.  *Wall*, 561 F.3d at 1067 (internal citation and quotation marks omitted).  His

decision is adequate if it discusses the uncontroverted evidence he chooses not to rely

upon and any significantly probative evidence the ALJ decides to reject.  *Id.*

        In the instant case, the ALJ gave the GAF score the same weight Dr. Robbins

gave it.  Dr. Robbins never said Plaintiff's GAF score limited Plaintiff's ability to work; in

fact, she never explained why she assigned Plaintiff a GAF score of 44.  (*See* Doc. # 11

at 158.)  Moreover, because Dr. Robbins was not a treating source, her opinion was

"not entitled to the sort of deferential treatment accorded to a treating physician's

opinion."  *Doyal v. Barnhart*, 331 F.3d 758, 763 (10th Cir. 2003).  However, even if she

were a treating physician, the ALJ's treatment of her report was sufficient.  He

14

summarized her report and gave no indication he was rejecting it.  Given those facts, the law does not require that he specifically discuss the GAF score.  *See Zachary v. Barnhart*, 94 Fed. Appx. 817, 819.  In sum, given Dr. Robbins' lack of explanation, her status as a non-treating source, and the fact the ALJ did summarize the report, the ALJ's treatment of the GAF rating was adequate.

*(ii)     Mischaracterized Findings*

Plaintiff also charges that the ALJ mischaracterized Dr. Robbins' findings.  This is not accurate.  Plaintiff criticizes the ALJ for referring to Plaintiff's concentration and other mental processes as "fair" when he failed to correctly spell "world" backwards and made other mistakes when evaluated by Dr. Robbins.  However, it was Dr. Robbins, not the ALJ, who described Plaintiff's abstract thinking, judgment, concentration, and reasoning as "fair," despite the mistakes he made.  (Doc. # 11 at 158.).  Plaintiff's criticisms are unavailing.  Morever, in suggesting that Plaintiff's mental faculties should be graded less than "fair," Plaintiff is asking the Court to reweigh the evidence, a task beyond the Court's purview.  *See Salazar,* 468 F.3d at 621.

*b.     Dr. Glasco*

Plaintiff also argues that the ALJ erred by ignoring Dr. Glasco's assessment regarding Plaintiff's trouble with supervisors.  In addition to the wording of the ALJ's opinion, Plaintiff cites to errors in the ALJ's treatment in his questions to the VE and his RFC finding.  (Doc. # 16 at 15.)  Plaintiff's argument fails.

15

A review of the record confirms Defendant's counter-argument that the ALJ's decision, including his questions to the VE and his RFC finding, reflected due regard for Dr. Glasco's assessment.  In his assessment, Dr. Glasco observed that Plaintiff should not "work closely with supervisors *or co-workers* . . . ."  (Doc. # 11 at 172.)  The ALJ, when posing his first question to the VE, included the limitation, "occasional dealing with co-workers."  In his RFC assessment, the ALJ included the limitation, "limited to occasional interaction with co-workers."  Plaintiff directs the Court's attention to the conspicuous absence of the word "supervisor" and argues that, without it, a remand or reversal is warranted.

Defendant argues in rebuttal that "there is no reason to believe the word 'co-workers' cannot also refer to 'supervisors.'"  (Doc. # 18 at 25.)  The Court agrees with Defendant.  The Court also notes that Plaintiff's selective parsing of the record, in which he bases his appeal on the quality of the words chosen or the absence of what he deems a critical word, underscores the deferential standard of review.  If the ALJ's factual findings are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Lax*, 489 F.3d at 1084, they will not be disturbed.

To illustrate, Plaintiff takes issue with the way Dr. Glasco's assessment was characterized by the ALJ in his decision.  (Doc. # 16 at 15.)  Dr. Glasco stated in two clauses that Plaintiff "cannot work closely with supervisors . . . [but] can accept supervision . . . if contact is not frequent."  (Doc. # 11 at 172.)  The ALJ characterized

this by writing that, "[Dr. Glasco] felt the claimant was limited to non-complex work with little exposure to the public or co-workers." (*Id.* at 17.)  As should be obvious, the ALJ's one-sentence summary (a factual finding) of Dr. Glasco's two-clause note (relevant evidence) is accurate and certainly adequate to support the finding.

However weak his position may be, Plaintiff sought to bolster it by adding a new wrinkle at the hearing before this Court on June 8, 2009, during which he pointed out that Defendant's own paperwork draws a distinction between co-worker and supervisor. It is true that one of the forms completed by Dr. Glasco draws a distinction between the two, in a section titled "Social Interaction."  (Doc. # 11 at 171.)  Question 14 addresses Plaintiff's ability "to accept instructions and to respond appropriately to criticism from supervisors."  Question 15 addresses Plaintiff's "ability to get along with co-workers . . . ."  That distinction, however, is inconsequential, as Plaintiff failed to mention that Dr. Glasco answered each question identically, rating Plaintiff's ability to interact with each group as "moderately limited."  The ALJ's omission of the word 'supervisor,' then, if an error at all, is a harmless one.

2.    The ALJ's Regard for Plaintiff's Subjective Complaints

Plaintiff's also argues the ALJ erred in assessing Plaintiff's credibility.  To the contrary, the ALJ's written opinion reflects a thorough consideration of all of the medical evidence, including Plaintiff's subjective complaints. (*See* Doc. # 11, 14-17.)

ALJs are given substantial discretion in evaluating the evidence and gauging witness credibility.  *See Williams v. Bowen*, 844 F.2d 748, 755 (10th Cir. 1988); *see also*

*Winfrey v. Chater*, 92 F.3d 1017, 1020 (10th Cir. 1996) ("Credibility determinations are peculiarly the province of the finder of fact . . . and we will not upset such determinations [if they are] supported by substantial evidence.").

The ALJ discredited Plaintiff only after reviewing Plaintiff's testimony in light of the objective evidence in the record.  For instance, the ALJ doubted Plaintiff's claim that he was working only three to four hours a day when his pay stubs revealed he averaged 35 hours a week.  (Doc. # 11 at 17, 91-101.)  The ALJ also doubted the severity of Plaintiff's alleged ailments because Plaintiff was not taking any medication.  Plaintiff maintains the reason he is not taking medication is because he cannot afford it.   (Doc. # 11 at 28.)  The argument is compelling in that it touches on the underlying rationale behind the system of social security benefits.  However, the ALJ was justified in discrediting Plaintiff's claims, so long as he could tie his credibility determination to specific evidence in the record.  *See Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009).

The record supports the ALJ's credibility determination.  First, as mentioned, there is the discrepancy between the pay stubs and Plaintiff's testimony.  Second, Plaintiff represented to Dr. Finnoff that he was on Dilantin from June 2005 through July 2006.  (Doc. # 11 at 28, 76, 113, 115, 139, 148).  Thus, the record reflects he was able to afford Dilantin in the past.  Third, Plaintiff provided no evidence that he "sought to obtain any low-cost medical treatments from [his] doctor or from clinics or hospitals" or that he had "been denied medical care because of his financial condition."  *Mann v.*

*Astrue*, 284 Fed. Appx. 567, 571 (10th Cir. 2008) (internal citation omitted).  Fourth,

there is evidence the Plaintiff smokes marijuana, "two times a week if he can get it,"

which suggests he has money to afford it.  (Doc. # 11 at 155.)  See *Sias v. Sec'y of*

*Health & Human Servcs.*, 861 F.2d 475, 480 (6th Cir. 1988) (court properly considered

evidence that claimant, who alleged he could not afford support hose prescribed by his

physician to alleviate swelling, also admitted that he smoked two packs of cigarettes a

day).

Apart from the medication issue, Plaintiff's daily activities supported the ALJ's

adverse credibility determination.  Plaintiff admitted that he could shop, do household

chores, cook, manage his money, bathe, dress himself, visit with friends once or twice

week, and work with two individuals on a daily basis.  (Doc. # 11 at 38-39, 116, 119,

149, 154-55.)

In sum, given the deference accorded ALJs' credibility assessments and the

thoroughness of this ALJ's opinion, it is the Court's conclusion that the ALJ's

assessment of Plaintiff's credibility and RFC is in accord with substantial evidence in the

record and free of legal error.

3.    The ALJ's Conclusion at Step Five

Finally, Plaintiff contends that the ALJ's conclusion at step five is not supported

by substantial evidence.  Though the argument is less than lucid, it appears that Plaintiff

is arguing that there is an inconsistency between the VE's testimony and the Dictionary

of Occupational Titles.

Plaintiff's RFC, as determined by the ALJ at step four, reflected the limitations stated in the medical opinions, which advised that Plaintiff should stay clear of moving machinery.  (Doc. # 11, 152, 165).  It reads that "[Plaintiff] is precluded from working near . . . moving machinery . . . ."  (Doc. # 11 at 13.)  Plaintiff cites as error the VE's response when asked by the ALJ for sample jobs Plaintiff could perform not involving moving machinery.  (Doc # 16 at 20.)  The VE provided three jobs: assembler of small products, collator operator, and developer of automatic film.  (Doc. # 11 at 40.)  Each of these jobs, Plaintiff argues, involve "machines with moving parts."  Plaintiff equates "machines with moving parts" with "moving machinery."  (Doc. # 16, at 19-20.)

There is a difference between a "moving machine" and "machinery with moving parts."  There is evidence to support Plaintiff's refrain from the latter but nothing to suggest he should stay clear of the former.  (*See* Doc. # 11 at 152, 165.)  Thus, the VE's response, which allowed for Plaintiff to perform jobs involving "machines with moving parts," is free of error.

Plaintiff also argues the ALJ's hypothetical questions to the VE were deficient because they did not account for Plaintiff's subjective complaints.  (Doc. # 16 at 19.)  The Court has already rejected Plaintiff's challenges to the ALJ's RFC assessment.  The ALJ posed a hypothetical question to the VE that included all the limitations the ALJ ultimately included in his RFC assessment.  Therefore, the VE's answer to that question provided a proper basis for the ALJ's disability decision.  *See Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993).

## IV.  CONCLUSION

The ALJ's denial of Plaintiff's applications for disability benefits and supplemental income is supported by substantial evidence in the record and free of legal error. Accordingly, the Commissioner's decision is AFFIRMED.

DATED:  June 22, 2009

BY THE COURT:

_____

CHRISTINE M. ARGUELLO
United States District Judge